District of California. It is appeal number 171118. The case returns to us after an earlier visit here and following a remand and a retrial. It's my understanding that you want to reserve five minutes for rebuttal. Is that correct, Mr. Rosenkranz? Yes, Your Honor. Okay. Let me begin. Thank you, Your Honor. May it please the Court, Josh Rosenkranz representing Oracle. Your Honors, I'd like to spend my time this afternoon focusing on two topics. The first is J-Mal unfair use, which I will get to in a moment. The second is the one-two punch of the district court's decision to cut key evidence of key markets out of the case, followed by Google's misrepresentation, which together left the jury with less than half the story on the two most important fair use factors. To start with J-Mal, there is no case upholding fair use where an infringer copied so much, put it in a competing commercial product, admitted that the whole point of the use was to appeal to the fan base, and in particular what was familiar to the fan base, and then succeeded in barring the original author from a lucrative new market. In any other context, a competitor simply cannot do what Google did. You can't take the most recognizable portion of a short story, adapt it into a film, and then defend by saying you were in books, we were in films, different context. Or you could not have made a good movie anyway, so where's your production facility, for example? Did you ask the court to instruct the jury that merely moving the use from one vehicle to another is not sufficient to make it transformative? Yes, Your Honor. I mean, there were all sorts of fair use, transformative use instructions that we raised to the district court, and the district court went with sort of a montage of this court's instructions. But I would hasten to add what matters under Ninth Circuit law for purposes of J-Mal is what the law is, not what the jury instructions were. And the question of transformative use is a pure issue of law. There is literally not a single fact that is in dispute here that would change the answer to the transformative use question. Well, and that's important, because as I understand the Ninth Circuit rules with respect to how we review these questions, all the historical facts are to be reviewed with deference, but the ultimate legal conclusion is reviewed de novo. So the question is, what are the historical facts? When we've got a black box verdict, it's difficult to ferret them out. Well, Your Honor, so first I'll preface by pointing out that fair use cases almost never get to juries in the Ninth Circuit, actually, or anywhere else. And precisely because of what you said, Your Honor, which is Ninth Circuit law is exactly what you just quoted. So historical facts. Historical facts are the who, what, where, when, how, how much. None of that's disputed. At least, I should say, there's no dispute of material fact, which this Court focused on last time around, no dispute that would change the answer to any fair use factor, much less the balance among all of the factors. Can you address specifically the potential market? It's practically a factor by itself, but anyway, it's written expressly into factor four. Is that a historical fact, whether Oracle had a potential market in the carry-around devices? There are contexts in which there can be historical facts here. Here, there's no dispute of historical fact. I mean, the facts about where we were and where we were in Is it a fact question whether the smartphones and tablets were a potential market for Oracle? The answer is no. Let me put it this way. You might think that it is a fact question that has only one reasonable answer. I'm asking a threshold question. Is it a fact question? The question whether it was a potential market. The answer is no. It is the question whether it was a potential market is something you answer based upon other historical facts like where were you, where were you intending to head. I mean, a very good example is Worldwide Church. There was a potential market there. It was a market for taking this liturgy and providing commentary on it. It was a decision that was made by Worldwide Church not to go ahead and do that. For nine years, they didn't do it, but the fact that they considered it made it a potential market. Stuart's another great example. I alluded to it earlier. So there it's a short story that turns into a film. There was no way that Publishing Company had the capability to actually turn it into a film. They were a publishing company. Let's come back to this case, Mr. Rosenberg. Yes, sir. I'm a little slow, so I need your help in understanding some of this. We have a jury verdict to deal with. And I'm sure that we'll hear from Google that the jury verdict has to be upheld unless there's no substantial evidence in the record to support it. I would assume that that's the standard litany that we will get. I'm a little confused now by your discussion between facts and law and what the ultimate conclusion is. Let's look at the jury instructions. Let's look at what the jury was told in this case. I'm talking now, of course, about the trial on fair use, not the earlier trial. This is what the trial court told the jury. It is your duty to determine the facts from all the evidence in the case. To those facts, you will apply the law as I give it to you. That's on page 2 of his instructions. And on page 20 of his instructions, he said, I'm sorry, on page 19, he said, it is up to you, talking to the jury again, it is up to you to decide whether all relevant factors, when considered fully and together, favor or disfavor fair use. In other words, he put the whole issue of fair use in their hands. According to the record, both Oracle and Google participated in the development of these instructions. And in fact, I gather there was quite a bit of going back and forth until finally the charging conference when you all agreed. Did you agree to those instructions? Well, Your Honor, there was a lot of back and forth on the instructions, as you said. I followed all of that. My question is, did you agree to those instructions? And if you didn't, where in the record is your objection? Your Honor, we agreed to give the whole case to the jury. That was the Ninth Circuit pattern instructions. But all that means is that there is a black box verdict to which this court applies its role, to use a quote from Reeves as the guardian of the law, and determine the consequence of a black box verdict is that this court takes all of the facts that are undisputed, layers on top of them any material dispute of historical fact. That is the universe of facts to which this court applies the law. That is the Ninth Circuit law when there's a summary judgment. That's the Ninth Circuit law when there is a jury verdict, even when you've told the jury that it is determining fair use. He then gave the jury, he said, I will give you a special verdict form to guide your deliberations. That form is one question. Yes. Who wins? Yes. Now, there are four factors that we ordinarily will want to look at. What was the jury's fact findings on each of those four factors? Your Honor, we have to assume... Don't tell me what we have to assume. Tell me what the jury found on each of those four factors. We have no idea. We have no idea, do we? Yeah. It is a black box just like this court reviews. I know obviousness is very different. So we can fantasize about what the jury did as well as you can. Is that... Yes, of course. And as to any historical fact, this court can assume the jury decided against us. So let me give you an example. No, I do think your obviousness analogy is actually a good one because as we said in kinetic concepts, you take the jury verdict, you have to assume that every fact that's relevant, every underlying historical fact was found in favor of Google and then determine whether there's sufficient evidence to support those facts and then finally on those facts, is fair use able to be determined based on those facts? And so what I am trying to understand is you say transformativeness and whether something's transformative is a question of law, not a question of fact. Now what is your... Yes, we see that discussed a lot of times that way, but it does seem to have a lot of factual components to it. So what's your authority for the proposition that it's always a question of law? Well, the authority for the proposition that's always a question of law is... So first there's Harper that fair use is a mixed question of law in fact. Fisher v. Deese said statutory factors are legal in nature. Mattel v. Walking Mountain says transformative use, there was a parody, quote, is a question of law. But let me explain how this works in the context of transformative use. So last time we were here, this court concluded that there was a disputed fact on whether Google's use of the declaring code serves a different function from the function it serves in Java. That was a critical piece of the transformative use inquiry. Now Google concedes, and the district court found, that the declaring code serves the same purpose in both. That fact alone... Communicating to app writers what words they should use with what punctuation to get the computer to perform certain functions. Well, I would put it a different way. The purpose of the overall SSO is to communicate to app writers how you use this platform in order to create an app. Now that fact alone, the fact that the expression means the same thing in both, there is no other disputed fact that can override the fact that the expression means the same thing in both. But there is an additional undisputed fact. Google concedes that it used Oracle's work to attract Java programmers to Android so that they would not have to, quote, learn something completely new. You put those two together, you can ask Google what additional historical fact is relevant to transformative use. Don't they assert as part of this element, probably others do, but at least this element, that they transformed it into a wireless program? Your Honor, that is their argument, that they transformed it from PCs and laptops into a platform that was suitable to... And I take it your argument about that is that that's true but irrelevant. Our argument is that's false but irrelevant. False as a matter of law, but also irrelevant. I'll explain why it's irrelevant. The focus has to be... False because of Target? False because we were in tablets, Amazon. False because we were in smartphones. As a matter of undisputed fact, we were in Danger. Danger Sidekick... Danger, that's what I meant. Yes, Danger Sidekick was a smartphone. Their chief of Android admitted that it was a smartphone. We were in early versions of smartphones. But to get to the legal question... But isn't it also the case that they were into desktops or other kinds of equipment as well? At the time, Android wasn't. Android now is, but we were. And so basically the transformative use argument is, look at this transformation. We took something that was suitable for portable mobile laptops, so one type of small mobile computer, and moved it over to tablets, a different type of mobile computer. That's not a transformation of the sort that courts recognize. And that is one of the factors that the trial court cited to. But the trial court also cited to the fact that they combined it with a whole different package of programming code that effectively changed the nature of the work. What's your response to that? Well, Your Honor, yes. They combined it with an operating system that they got from someone else. That's not transformative. Ours was always combined with someone's operating system. And the fact... I mean, this court said it last time around. The fact that you add more material to that which you've copied, if what you copied is not transformative, adding more material doesn't make it transformative. If you take... Let's take Stuart. Stuart's a great example. 20% of the movie was from the book. The other 80% was added on top of that. That didn't make it transformative. You have to look at... And Ninth Circuit law is clear on this. Dr. Seuss says it very clearly. You have to look at that which is taken and ask, does it express something different? That code means the same thing. It was conceded by Google. It means the same thing in Java as in... Oh, I see my time is up. But I did want to talk about the new trial. Yes, we'll give you one minute to do that and then I'll give you your five-minute rebuttal back. So talk about the new trial. Okay, so if this court does not resolve this case as a matter of law, there has to at least be a new trial. And to understand both new trial arguments, you have to understand one key fact. The same exact copyrighted work that is our APIs is in the same versions of Android, say Android Marshmallow, which is in multiple devices. Smartphones, tablets, cars, now PCs and laptops. When Section 107 says you have to consider the effect of the use, you have to consider the entire effect, not some of it. The district court's decision to silo different sorts of harm into different cases was based upon a fundamental misunderstanding of law. It misunderstood what infringed. The act of infringement was the copying of our APIs into the Google platform, into Marshmallow, for example. The fact that various manufacturers then took that and put it into different devices, that just means it's different markets. But was there clear evidence that the Android system that was being used in those other devices actually did use these same packages? Yes, Your Honor. There's no dispute. That's the difference between the declaratory part and the implementing part? I would say no, Your Honor. It's our 37 packages were indisputably and conceded by Google to be in every version of Android that is accused, all the way up through Marshmallow. Our APIs were in there, if that's what Your Honor's question was. There's no dispute about that. In fact, after the district court accepted our complaint challenging all of the additional, that is the supplemental complaint, challenging all of the additional versions of Android up through Lollipop, Google then stipulated that Marshmallow also had those same APIs. Did you ask that those other devices be included for purposes of seeking damages with respect to that infringement, or simply that you be permitted to introduce evidence with respect to those other devices so that you could argue that that evidence is relevant to factors one and four? Both, Your Honor, but certainly the latter. By the time the district court was saying those devices are out of the case, we were saying, wait a minute, you can't atomize market harm. You can't say, well, for this case on Marshmallow, we will consider these markets and not look at other markets where we clearly were overlapping. I mean, we were in autos. We were in TV to the tune of 125 million TVs. And there is no way Google could have made the argument to the jury that it made to the jury, no big deal, we're in this market, Oracle is in that market, never the twain shall meet, when in fact there were markets that were overlapping, and both the purpose and the effect would have been viewed by the jury as fundamentally different. Okay, we'll just keep going. Let me pursue this a little bit further with you. What was the point of your supplemental complaint? The supplemental complaint that you filed? Your Honor, the point was, like any supplemental complaint, was to update the case after two and a half years of being away. And the district court accepted the complaint. We conducted, and without any objection by Google, we conducted six months of discovery on those markets. In that complaint, you mentioned TV, you mentioned autos. Wearables, auto, yes. Was that not before, were those issues not in the case before that? Were they not brought up in the infringement part of the litigation? Well, Your Honor, I think that the most important thing to understand legally about this issue is that we accused the platforms of infringement, not particular devices. Those other devices didn't exist the first time around. So the first time around, Android was new, and it was only in smartphones and tablets. But we updated the case. That update was accepted. We did discovery about it. There were expert reports about it. And then ten days before the trial, the district court announced, I am lopping off these markets and this evidence, even to the extent it bears on purpose. And again, if you listen to Google's argument about their purpose, they say their purpose was about adapting to smartphones, and our purpose was about PCs. I'm puzzled because I would have thought that this last discussion we're having would have been your main point of argument, that you didn't get a fair trial because all of this material never got to the jury in a useful way. But that's not your point, I take it. It had to be your point when you brought in that supplemental complaint. Yeah, well, this was devastating. This is our main new trial argument. We have a JMAL argument that says we don't even need a new trial because as a matter of law, Google did not demonstrate fair use on any particular factor, much less this court's job is clearly to analyze the factors en masse and figure out how they weigh against each other. Okay, well, I think we've gone way over. So I'll give you some more time to...  when we get to that point. Thank you, Your Honor. Thank you, and I'll give you your five minutes back. Good afternoon, and may it please the court. This court was right the first time when it denied JMAL, found there were disputed questions of fact on all four factors, and remanded for a new jury trial on fair use. The jury then heard evidence from 29 witnesses across nine days and heard conflicting testimony... Can you talk about the transformative piece? Of course. I mean, we know we have a jury trial and a law trial, and thought it would be awful to do this again and all the usual stuff, right? But let's talk about the specifics. Transformative. One question. How does your theory of transformative preserve in a robust way the right to... exclusive right to derivative works? Well, sure. First, as you know, the exclusive right to derivative works is, by statute, subject to the fair use defense. So it's one of many rights... It's not that likely that these would be contradictory, right? So you want to give them some robust meaning? And derivative work has the word transform in part of the definition, doesn't it? The statutory definition of derivative, yes, for some other... which is directed at the underlying right, does have transform in it. So it gets confusing in that respect. So the fact that you took a set of packages, the copyrighted material that's now at issue here, and made it into a robust smartphone and tablet platform or programming environment for app writers, assume that, which I think... assume that you did that. Why is... was that... How can you say that that's transformative without eliminating... effectively eliminating their right to make a derivative work for smartphones and tablets? Well, they have a right to make derivative works for certain. Whether this is... But many works that you could... There are many works where I could take part of an existing work, add some new things, call it a derivative work. I mean, how can that be true here? Being transformative. How can that be so here? Well, because what Google did here on the facts is so incredibly transformative. I mean, it took a little bit of J2SE, less than one-half of one percent. It added 100 new packages. The part that you thought was key to the new devices. I think key is that your witnesses were. It was... It was your briefs were. Those were the ones that Google understood that programmers would want to be able to use in the context of mobile device, the ones with overlap. So the thing is... But again, just for purposes of programmers using their established familiarity with the Java programming language so that they could use those method headers, the shorthand commands. Did you have evidence that all of the stuff that you took and put into Android was necessary for programmers to use the Java language? I thought there was at least a stipulation about some very small portion. Was there further evidence that you put on the trial that quite a lot of or even all of the 37 packages and their structure was essentially necessary for programmers to use the Java language? Right. Well, the distinction is between technically and practically necessary. The stipulation said that at least some of them were technically necessary and Oracle agreed that those were necessary. Oracle agreed those are fair uses as a matter of law. With respect to others, there was evidence that... The evidence with Google's argument has always been that they're practically necessary. Right, but you agreed that they're not technically necessary. Not technically in the sense that you could do some things with Java. But again, the idea would be then what are you going to do? Instead of using a shorthand command to pull up the code to implement a function, the programmer's not going to type up his own implementations of all of these functions. And Google could, instead, have come up with totally different declarations, but then none of those shorthand commands would have worked. And so then, it's what the district court talked about, it's scrambling all of these systems. So, all right, we went through all that part the last time. Let me focus on the issues that I think that where Toronto was trying to direct you, which is what is it that you used these for purposes of creating a programming language, correct? We used these as part of the new operating system. As part of creating the new operating system, creating the programming language for the new operating system. I mean, the programming language is Java, but... Speak up a little bit. I'm sorry, I was going to say, I mean, the programming language is Java. I don't mean to quibble about what was created, but... How do you get around the Ninth Circuit law that says merely using something and putting it into essentially a different context does not equate to transformativeness? Well, the Ninth Circuit cases stand for the proposition that if I have, you know, if I... It's not a different context, if I just have, say, a different medium. If I, at J2SC, store it on one type of storage medium, I move it to another type of storage medium, that's not going to be a fair use. Right, but if you take a short story and make a movie out of that, that's got to be a different context. And that's classically something that you can't do and just say, oh, you know, the guy in the Brooklyn apartment who wrote the story, whoever it was, he doesn't have a movie studio and lights and all that stuff. He can't do that. Well, let's assume that on the facts that would be a different new context, right? It's still the factual question of what's a different context, and here on the computer side, it can be different. The jury heard a lot of evidence that an operating system for smartphones was an entirely different context from an operating system for computers, for personal computers. So, for example... That was key, then, to your transformation position, wasn't it? That you all were engaged in smartphones, they were engaged in computers. Wasn't that... That was absolutely the transformative purpose. That was your whole key to the transformation issue. And... But aren't you supposed to be transforming the work, not just the... Well, this was going to be one of my key points, that when the question is... They talk about the line of computer code having the same purpose in two programs. That's not the right level of which to look at it. The question is whether you transformed one original work into another work. And so that is... Campbell talks about transformation of the works, Seltzer of the original work. And that's the transformation here. You start off with... You start off with J2SE. You take less than one-half of 1% of it, which is declarations which are predominantly functional. You then add all of these new declarations for the mobile environment. You then add all of this new implementing code for this new environment and come up with what the witnesses consistently testified, including Java's witnesses, was an incredible new creation. In terms of... Even assuming, for argument's sake, that that's transformative, the difference between using your APIs for smartphones versus using them in a computer setting, is it the case that after that supplemental complaint was filed, that distinction disappeared in the case? Is that not true? No. You all didn't object to the filing of the supplemental complaint, did you? Not the filing of the complaint, no. And everyone, I take it, agreed to the instructions to the jury at that time. But by that time, the distinction between smartphones and computers had disappeared from the factual basis of the case. Just to be clear of what we're talking about, you mean things like Android Auto, Brillo for the Internet of Things, refrigerators, that type of thing? By that time, Oracle had established that these were the things it was doing and it was overlapping with the things that you were doing. It wasn't... Well, there were two things, important things. First, it is important that this court had already... was remanding for a new trial. And when a district court has remanded for a new trial, under Ninth Circuit precedent, it has very broad discretion to determine whether to expand the issues, arguments, evidence in the case. The district court here on page 55-58 was worried about juror confusion from blowing the scope wide open relative to what it already had. But even apart from that, it's not the case because the uses have to be assessed. You have to look at this on a work-by-work basis, on a use-by-use basis. And there are two key failures of proof here. One is the notion that came up before that there's just one Android operating system. Anything that's got the name Android in it, it's got that in it. One is false. But two, there's also no evidence of it. Oracle assured the court it could do that quickly. They never even put in an offer of proof. So there's no evidence that any product with Android in the name has that same Android operating system in it. And going a little bit out of the record here, it's not the case. Can I take you back to the J-Mal piece and focus in particular on this? You don't dispute that for a few years Oracle was voluntarily and in good faith negotiating with Google. Didn't work out, but that was happening. Yeah, there were negotiations with Sun over a much broader development partnership, I mean, over a lot else. But specifically, I thought it was specifically referenced in testimony by Andy Rubin and emails and whatnot. So why does that fact alone not suffice to establish as a matter of law that this market that they were interested in was a potential market for Sun Oracle? Well, Campbell squarely rejected the argument that failed licensing negotiations. No, not failed. That was rejecting the argument that failed licensing on the part of the defendant tells you something about they kind of knew they had to do it and they went ahead and did it. I'm talking about the question of whether these wireless devices, the tablets and the smartphones, were a potential market for Sun Oracle. They negotiated for, I don't know, what is it, four years or something before the whole thing ended. Doesn't that establish that they were interested in that market? Not obvious, perhaps not, to do it themselves. But the guy in Brooklyn with the store, he isn't going to make the movie either. The potential market is a market for him to license somebody else to do it. What's wrong with that? Well, sir, so the Oracle was interested in engaging in licensing negotiations with Google. One can very reasonably determine, just means that Oracle was interested in trying to make money if Google would give it to it. But what you then have, though, is... I don't think I even quite heard what he... Well, the fact that Oracle engaged in licensing discussions with Google... Doesn't it show that it was interested in the market that was the subject of the negotiations? Well, we know it was interested in making money from a Google partnership. For wireless devices. Yes, but all of the evidence here shows that it wasn't just that Sun was not able to do this itself. It's that Java 2 SE, or Java generally, was not situated to be moved into the mobile environment. And the jury heard a lot of evidence that could have agreed on that. Sun's internal documents said it had, quote, no solution for smartphones. It's appendix page 55540. Well, obviously, portions of it were suitable for moving into the mobile environment, or you wouldn't have taken it. But what was taken was less than one-tenth of one percent of Android. So it's a tiny portion of what... It's also what was taken was less than one-half of one percent. Well, there's plenty of case law that says that that's irrelevant. Well, it's not irrelevant to transformation, because in transformation, you're looking at what did the defendant add. Did the defendant add something new, add value, such that you have a new creation and a new context? So you have to look to what was added for that purpose. Maybe not for others, but for that purpose. And what you have there is Google added all of this new and fluctuating between market harmony and transformation because there's some relationship. But remember, Oracle's own witness testified the move to smartphones was the greatest technological evolution he'd ever seen. Smartphones were unprecedented. Oracle's formerly Eric Schmidt testified he'd never seen anything like Android. It was completely different from any other approach. Oracle's Barr testified that Android embodied a major shift in the market that transformed the status quo in significant ways. And the reason was that, as Dr. Astrakhan testified, tiny phones with vastly different functionality differ a lot from big PCs with, again, very different functionality. Tell me why there isn't an obvious counterpart to that when the movies were invented or talkies were invented or Technicolor or... Right, streaming video now. So that the guy with the story says, wow, you can put this on the screen and people can see it. They don't have to imagine it from reading the words. Right, but if it's just another way of delivering the same content, here's a movie, here's a movie. Very reasonable to conclude in the same context. Except in Stewart, I mean, I take it Mr. Rosencrantz said that... Was that Rear Window? Is that the movie? Stewart against Abbond? Yeah, so that what, 80% of the material was new and not just the actors and the hitchcock. But take the, I mean, it's a factual question. Like, take L.A. News. You had a film clip involving the Rodney King meeting, very well known. The Ninth Circuit held it was fair use to take a very well recognizable and popular, well recognized known clip of that. I thought that it was fair use to use it for one purpose, not for two of the other purposes. Right, but both of those... The Ninth Circuit had that three times. I know, but all those purposes involved showing that video on television, is my point. So it's not just enough to say that, okay, it's a video, you're showing a video, it's on television. You've got two different contexts. In the same case, that's two different contexts. Right, but the fact that it was on television was not relevant. In other words, the fact that it was shown on television or shown in a movie theater, that wasn't relevant to why the Ninth Circuit felt that there was a transformation of the material. No, it's what they were doing with it. And here, what Google was doing with it was, again... Was providing app writers an efficient way for them to write programs, to do, to perform functions. And that's what the Java version did. Except that... Same purpose. Except that for transformation, we are supposed to be looking to the transformation of the original work as a whole to the new work as a whole, not just narrowly at whether the defined portion of it will do the same thing. Do you agree that transformation is a question of law? Not in this case. I mean, the summary judgment case is everything is a question of law. But here, I mean, transformation... I mean, whether you're going to take... Whether you've added to it such that you have a new creation and a new context is an inherently fact-specific question. Not always. So that's what I'm trying to... But here... I think there's a lot of case law that says the statutory factors are questions of law. But that... So when you were here last time, and you argued that if we found a copyrightable, it had to get remanded when Google was here, that it had to be remanded because there were disputed historical facts. And so what I'm trying to determine is what do you think the historical facts are. It's not helpful for either side to just say, well, whether it was transformative or not, because it's the facts that underlie that conclusion that are the important ones. So what are the facts? Number one is, were smartphones a new context, which turns in part on some of the evidence I was discussing about how the smartphones were this incredible technological evolution. It turns also on all of Sun's documents, saying that it tried. I mean, and it wasn't for lack of ability. It was Sun's witnesses, Brenner, for example, said he tried and failed to build a mobile platform using these APIs. Ellison testified that Oracle never had a product that could compete in the smartphone market. Do you think that the story writer in the Brooklyn apartment who tries his hand at writing a screenplay and tries it several times, and everybody in the movie business who knows anything about it looks at the screenplay and says, you are in the wrong medium. Great story. You don't know how to do dialogue. You don't know how to do pacing. Does he lose his right to prevent somebody else from, you know, Robert Town or somebody from writing a screenplay about it? Not if it's a traditional, reasonable, or likely to be developed market for the original work. But two things, which is important, because that's the Seltzer standard. It's not just anything you might do with it. That gets too broad. I mean, if someone does something incredibly transformative, you know, to be given credit for the fair use, you can't say, well, it's in a market that, it's, you know, in a market that's a little far removed. But again, here on the facts, first, Sun's software company. So if we took the Beatles song and live-streamed it on the computer, that would be transformative? No, it's the exact same content, just in a different medium. Like taking Java 2 SE and copying it to a different storage device. Of course not. But here, one, it's, as Ellison said, it's this incredibly new environment. And two, all of Sun's witnesses recognized that it wouldn't work. Stahl testified in his video deposition that you have to modernize the API significantly in order to make them work for smartphones. And so the point is, one, in terms of your question before that, I mean, one, Sun's a software company. It knows how to do software. And two, the jury can at least infer as a fact that the problem wasn't Sun's lack of ability with software. But instead, it was this incredible transformation that therefore qualified as a fair use. Otherwise, you'd end up with nothing's a fair use because someone could always take the product and do something else with it that someone else didn't. So when did Google start using Android in desktops and laptops as well as using it in smartphones? Sure. So the ARC program is what's discussed here. It's the Application Runtime for Chrome, where you have the Chrome operating system, and then there's this add-on that allows them to run some. ARC went back to, sorry, I'm not sure exactly. The important thing about ARC, though, is that it's been presented as a discovery misconduct issue. Google disclosed ARC throughout fact discovery. It was discussed in depositions. But this is ARC++. Right, which is just the latest iteration. So ARC throughout discovery, it's in expert reports, it's in depositions. They knew all about it. This is the district court's point. ARC++, just the latest iteration to try to do that better so that all apps could run on it, that started in September of 2015. The discovery responses in question were in December of 2015, and they included documents concerning the latest update of ARC++. While the trial was still on. Well, so this was six months before trial in December, the documents about the technical details and goals. It wasn't finished, though. The code wasn't finished until a month after the trial in June of 2016, which then is when it was first rolled out to developers a month after the trial. May of 2016, Google announced that this is where it would go. Announced that it was going to be, that ARC++, the new version, was going to be coming out. It would be releasing it through developer channels. A month later, it actually finished the code and did that. All these facts are in the declaration of, sorry, one of Google's attorneys, that the district court relied on, which is why the district court, after looking into this incredibly carefully, taking after Davis and all, said he thought Google had fostered a major, you know, was fostering a misimpression with a totally unfair argument, which is correct. Oracle. You mean Oracle. Oracle. Oracle. I'm sorry, I misspoke, obviously. Sorry. You're going to have to wrap up. We did give you a lot of extra time. Okay. Sorry. It's easy to control the lawyers. It's not so easy to control these guys. Am I right that in this case, at least at this stage, we don't have the particular kind of interoperability concern that loomed so large 25 years ago or something in Lotus against Borland, there's an installed base on end-users' computers of files written in a language that Lotus 1.2.3 there, that in order that the new software really would be important for any new competitive software to be able to run those programs or end-users are going to stick with 1.2.3. That was the theory, obviously. The compatibility issue here is different. It's compatibility for programmers. If programmers, you know, Java said go use, Java encouraged everyone to use the language. It also repeatedly said that the declarations are free for anyone to use without a license. There's tremendous testimony about that in the record, which is also important. But the point is that once developers did that, once they developed their fluency with Java, then they should be able to sit down and use the language and the familiar shorthand commands in programming in this new context. And that's what Google was looking to allow them to do for the packages that did have overlap that would also be relevant to this new context. Because remember, the smartphones have tremendous amounts of functionality you don't get in a PC, phone, camera, flashlight, GPS, all those things. Similarly, PCs have all sorts of issues that mobiles don't. So you have different packages. But for that overlap, the point is just that in order to encourage, first, consistent with Sun's repeated business model, which was to make the declarations free and then compete on implementations and services. But then, two, in terms of promoting the progress of the sciences and the useful arts, the idea is people should be able to use their acquired fluency to create new original works in this brand-new environment. Okay. I think we're done. That's it. Thank you. Your Honors, Judge O'Malley asked, I think, a really important question, asking for the help of the lawyers on identifying the facts that control the outcomes. So if you give me one minute, I can tell you the undisputed facts on the basis of which each factor has to be decided, regardless of any additional historical fact that Google might point out. Factor one, Google made $42 billion on Android that makes it commercial. The declaring code has the same purpose in both platforms. That makes it non-transformative. Java ran tablets. That's Amazon. Smartphones, in danger. And a full-stack mobile platform, that's Savage, before Android. So Google's view of transformation is wrong as a matter of law anyway. Oracle intended to license in smartphones. That means it's a potential market and it is a natural, reasonable market for us to look at. Factor two, there is a vast number of ways to write and organize the APIs. That makes it creative. Only 170 lines of code were necessary to write Android in the Java language. That makes everything else? Technically. Technically. But this court already addressed the relevance of the non-technically piece to creativity. Still on factor two, Google did not need to copy the APIs in order to write the platform in the Java language to your point about technically versus. I mean, the fact that it was creative doesn't mean that it doesn't also have some functional aspects. Absolutely, and the law in the Ninth Circuit and from the Supreme Court is clear. The question is whether it's creative. If it also serves a function, that does not withdraw the creativity. I mean, that is Stein, Mazur. Factor three, Google copied 100% of the SSO from those 37 packages. Google copied, quote, to leverage the existing. I'm sorry. I thought that the works in question here are the two registered JSE, whatever. Your Honor. So that this is, if the question is in some quantitative sense, not a qualitative sense, did they copy a large or small amount of the copyrighted works as alleged in the complaint? The answer is small. Quantitatively correct. Small as to the declaring code. Huge as to the SSO. It was everything in those 37 packages. And look at Harper and Rowe. That was 300 words out of 655 pages. Quantitative is not the end all and be all. Just to continue the litany, I'm still on factor three. The declaring code was valuable even if Google says it was not the most important. Factor four. And this is really, really important because we did not talk about either actual harm or we talked a little bit about potential harm. Five facts. Amazon cited Android as the basis for demanding a 97.5% discount. That was since the last case on the Kindle. And we went from, this is undisputed, Java in generation of Kindle one, two, Android in the next generation of Kindle, to this 97% discount on Java in generation three. Third, sorry, second fact. Java SE competed directly with Android in the smartphone market. That's danger and savage. Third, Android caused Savage to lose investment. That is undisputed. Wasn't there evidence that Savage wasn't really a smartphone? Couldn't the jury have accepted that proposition? There was no evidence that Savage was not really a smartphone. I mean, Rubin, the Android chief, agreed it was a smartphone. It was just, there was evidence that it was not a very good one. But an author doesn't get, I mean, the film producer doesn't get to say, I plagiarized your work because you were going to make a lousy film or I did a better sequel than you. Fourth fact, Samsung cited Android to extract a $39 million discount. Final fact for harm, Android made it impossible for Oracle to enter the market with a Java SE derivative. Now, let's look. Was Java SE in Savage in Danger? Yes, Your Honor. Java ME, I have not even talked about Java ME, which was in all the other mobile devices, which makes it so obvious that we were in a position to either license for or create another mobile platform. Java SE was in Savage. That is actually a transposition of Java SE. And it was no question in Danger. It is in the phone Danger. That was a smartphone. It was one of the most popular smartphones of its day. It was Sidekick. So, Mr. Josepher identifies, let's go to transformative use. Factual disputes, he calls them, on transformative use. The smartphone was a new context. That's not a factual dispute. That's a legal question on whether it's relevant. Sun failed to develop smartphones. We disagree on whether the fact has been established as a matter of law. It doesn't matter. If you did not make a very good sequel or you don't have a film company to make your movie for you, that does not mean that you don't have a potential licensing market. We were in the licensing business to the tune of $100 million with Java. And that was the market that was the potential for the smartphone. And to Judge Taranto's point, you are absolutely right. Our negotiations with Google for Google to create the next big Java SE-based platform is definitive evidence that we had a potential market for the next Java SE-based platform for smartphones. It's just that they then moved into it, occupied it, and made it impossible for us to license to anyone else, which was exactly the savage story. Okay, we need to wrap up. Okay, thank you, Your Honor. So let me, I'll just close with this. If copyright protection for code is going to mean anything, it must mean that a competitor cannot use copyrighted code for the identical purpose in competition with the copyright holder. Such a competitive use bears no resemblance to the sorts of fair uses that are described in the statute. It doesn't look like criticism. It doesn't look like comment. It doesn't look like research. All of those things do not substitute for you in the market. This does. Now, remember how path-breaking Java was, and remember that without Java, there'd be no Android. No software company is ever going to invest the hundreds of billions of dollars that it takes to create the next ground-breaking platform if their competitors can stand on the sidelines. We don't need the policy arguments, okay? Okay, thank you, Your Honor. All right, thanks. This court is adjourned. All rise.